IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION
Walter E. Hoffman
United States Courthouse
600 Granby Street
Norfolk, Virginia 23510



FILED
SEP 2 1 2010
CLERK, US DISTRICT COURT
NORFOLK, VA

**DAVID M. MONKMAN,**

        Plaintiff,

v.                 Civil Action No. _2:10cv465_

**BANK OF AMERICA, N.A.**
Please serve:
CT Corporation System
4701 Cox Road, Suite 301
Glen Allen, Virginia 23060
Registered Agent.

and

**BAC HOME LOANS SERVICING , LP.**
A wholly owned subsidiary of Bank of America, N.A.
Please Serve:
CT Corporation System
4701 Cox Road, Suite 301
Glen Allen, Virginia 23060
Registered Agent for Bank of America.

        Defendants.

## COMPLAINT

This is an action seeking enforcement of rescission of a refinance mortgage credit transaction pursuant to the federal Truth-in-Lending Act, 15 U.S.C. § 1601 et seq ("TILA").

### I. Jurisdiction

1.     This court has jurisdiction as to this case under the provisions of 15 U.S.C. § 1601 et seq. and 28 U.S.C. § 1331.

1

## II. Parties

2. The plaintiff, David M. Monkman ("Monkman") is a natural person who resides at 1502 Lafayette Boulevard, Norfolk, Virginia 23509 ("the home").

3. The defendant, Bank of America, N.A. ("Bank of America") is a for-profit bank doing business in the Commonwealth of Virginia.

4. BAC Home Loans Servicing, LP ("BAC") is a limited partnership which is a wholly owned subsidiary of the Bank of America.

## III. Facts.

5. On January 17, 2008, Monkman was the owner of the home, which was his principal place of residence. The home had been his principal place of residence for a considerable time prior to that date and has remained his principal place of residence continuously from that date to the present.

6. On January 17, 2008, Countrywide Bank, FSB ("Countrywide") was a creditor engaged in a large number of consumer credit mortgage loans, far beyond the threshold to bring it within the definition of "creditor" pursuant to TILA and to bring it within the governance of TILA as to refinance mortgage loans.

7. On January 17, 2008, Monkman entered into a refinance credit transaction ("the credit transaction") within the meaning of TILA in which the creditor was Countrywide giving as its address 1515 Walnut Grove Avenue, 2nd Floor, Rosemead, California 91770-3710 "Countrywide's address"), and Monkman was the debtor. The credit transaction was evidenced by a note ("the note") in the principal amount of $301,500, signed by Monkman bearing the date of January 17, 2008 in which Monkman promised to make payments to Countrywide. A copy of the note is attached to this complaint marked

"Exhibit A." The note was secured by a deed of trust ("the deed of trust") signed by Monkman bearing the date of January 17, 2008. A copy of the deed of trust is attached hereto marked "Exhibit B." The deed of trust was a lien on the home.

8. The credit transaction was entered into as a consumer loan and was governed by TILA and subject to the rescission provisions of TILA.

9. As to the credit transaction, Countrywide was required by TILA to provide to Carrington certain material disclosures as to the credit transaction ("the required material disclosures") including a TILA disclosure statement setting forth the annual percentage rate; finance charge; amount financed, total of payments; and number, amount, and due date of payments. However, Countrywide failed to meet that obligation, although it provided to Monkman a document titled "Federal Truth in Lending Disclosure Statement" ("the TILA disclosure statement") which purported to provide to Monkman in writing the amount financed; finance charge; total of payments; annual percentage rate; and amount, number and due date of payments. Attached hereto marked "Exhibit C" is a copy of the TILA disclosure statement, which disclosed the amount financed as $298,799.97 and the finance charge as $477,508.61.

10. TILA required Countrywide clearly to advise Monkman in writing of his right to rescind the credit transaction. Countrywide failed in that duty, although it delivered to Monkman two copies of a document titled "Notice of Right to Cancel," copy of which is attached hereto marked "Exhibit D."

11. Countrywide failed to comply with its duty to provide Monkman proper written notice of her right to cancel because it required him, as a condition of his loan application being considered, to pay Countrywide what Countrywide told Monkman was a non-refundable

appraisal fee. In order to have his application considered, Monkman paid Countrywide a non-refundable fee of $428.00.

12. Because Countrywide imposed such $428.00 fee, which was paid directly to Countrywide, and because Countrywide required such payment as a non-refundable fee in order for Monkman's loan application to be considered, Countrywide failed clearly to disclose to Monkman his unfettered right to rescind, and, in such event, to be free of any costs in connection with the credit transaction.

13. Attached hereto marked "Exhibit E" is a copy of the HUD-1 settlement statement setting what Countrywide asserted was an itemization of amounts disbursed from loan proceeds. Exhibit E stated that the amount of the appraisal charge made in connection with the loan totaled $475, with $393 paid outside of closing and $82 taken from the loan proceeds. This assertion in the HUD-1 was incorrect. In fact, Monkman paid $428 outside of closing to Countrywide, and an additional $82 was taken from the loan closing for appraisal fee. Countrywide imposed on Monkman a total appraisal fee of $510.

14. Countrywide required the service of an appraisal. Attached hereto marked "Exhibit F" is a document titled "Good Faith Estimate" from Countrywide to Monkman, in which Countrywide stated, in part, the following: "The Lender will require an appraisal from an appraiser we select from our approved list."

15. Attached hereto marked "Exhibit G" is a document which detailed the amounts disclosed by Countrywide as what it asserted to be the prepaid finance charge. Exhibit G and a comparison of Exhibits C and E show that Countrywide did not include any of the appraisal fee as part of the finance charge.

16. Although all of the appraisal charge was excluded from what Countrywide disclosed as the finance charge, $35 of the appraisal fee was, in fact, a hidden finance charge, because $35 of that fee both failed to be bona fide because not disclosed as part of the HUD-1 and unreasonable because that much more than the local going rate. Evidence of the local going rate included the assertion in the HUD-1 that the actual appraisal fee was $475.

17. Exhibit C (the HUD-1) stated that Monkman was paid $85,193.34 from the loan proceeds of the credit transaction, disclosed as Item 303 of the HUD-1. Exhibit G and a comparison of Exhibits C and E show that Countrywide did not include any of the amount stated as Item 303 of the HUD-1 as part of the finance charge. However, in fact, Monkman received only $85,193.24 of the amount disclosed as paid to him according to Item 303 of the HUD-1. On information and belief, Countrywide retained the difference of $0.10, which was therefore a hidden finance charge.

18. As a result of the matters set forth above, Countrywide charged Monkman a hidden finance charge of at least $35.10 and therefore under disclosed the finance charge by more than $35.

19. As shown from Exhibit C, Countrywide, in the TILA disclosure statement, stated to Monkman that his first 118 monthly payments were $2,360.77. According to TILA, Countrywide was required, as to those payments, to disclose to Monkman a total amount of the sum of the monthly payment of principal and interest and the monthly payment due for mortgage insurance.

20. Attached hereto marked "Exhibit H" is a document delivered to Monkman at the loan closing showing his first monthly payment of $2,360.78, being the sum of principal,

interest, and the monthly mortgage insurance premium. According to the loan documents, this was the amount due by Monkman for the first 118 months of payments.

21. As indicated above, the TILA disclosure statement (Exhibit C) under stated the amount of each of the first 118 monthly payments by $0.01.

22. Bank of America succeeded to the rights of Countrywide and became holder of the note, with BAC acting as Bank of America's servicer as to the note. Alternatively, BAC, as a wholly owned subsidiary of Bank of America, succeeded to the rights of the note.

23. Monkman fell into arrears as to the note.

24. On August 10, 2010, BAC, either as the entity having the rights of holder of the note, or on behalf of Bank of America as the entity having the rights of holder of the note, appointed Professional Foreclosure Corporation of Virginia ("the substitute trustee") as substitute trustee on the deed of trust.

25. BAC, for itself or for Bank of America, instructed the substitute trustee to foreclose on the home according to the deed of trust.

26. The substitute trustee advertised the home for foreclosure sale at 9:30 a.m. on September 22, 2010.

27. After the substitute trustee had advertised the home for foreclosure sale on September 22, 2010, and during the pendency of a non-judicial foreclosure sale, Monkman, by counsel, on the night of September 15, 2010 mailed a notice of rescission ("the notice of rescission") addressed to Countrywide at Countrywide's address, and to BAC. An unsigned copy of the notice of rescission is attached hereto marked "Exhibit I." The notice of rescission was sent during the pendency of a non-judicial foreclosure sale. Therefore, the tolerance for under disclosure of the finance charge was $35.

28. Monkman has made at least 26 payments on the note, totaling at least $53,475. The settlement charges for the credit transaction were at least $5,498. Thus, the amount required in tender in TILA rescission by Monkman is approximately $242,500. The home has a value of approximately $335,000. If defendants honor the notice of rescission, or if the Court adjudicates that he validly sent a notice of rescission, Monkman stands ready forthwith to put the home up for sale and avers that the net proceeds from such sale will be more than ample to make tender in TILA rescission and he stands ready to do that. He cannot be sure to obtain a net amount from sale of the home to make tender without the reduction in payoff resulting from TILA rescission. Therefore, he requests that the Court allow him a reasonable time after agreement by the defendants, or by one of the defendants acting as holder of the note, to his notice of rescission, or adjudication by this Court that he validly sent notice of TILA rescission.

29. Monkman's rights are in doubt and in peril.

### IV. Causes of Action

30. Monkman is entitled to a declaratory judgment that he sent a valid notice of rescission of the credit transaction.

31. Monkman is entitled to a declaratory judgment as to the amount he will be required to tender in TILA rescission as to the credit transaction.

32. Monkman is entitled to a declaratory judgment that any foreclosure auction conducted by the substitute trustee on September 22, 2010 would be void.

33. The Court has equitable discretion upon adjudication of Monkman's right of rescission as to the credit transaction pursuant to TILA, or upon agreement to TILA rescission by the

defendants, or by the defendant claiming to be the holder of the note, to alter the timing of tender to allow Monkman reasonable time to make tender in TILA rescission.

34. TILA provides for payment by a creditor of attorney's fees of a consumer in an action for enforcement of TILA rescission, so that the Court should enter an Order requiring defendants to pay the reasonable fees of Monkman's legal counsel for filing, maintaining and prosecuting this action.

## V. Demand for Jury Trial

35. Monkman calls for trial of this case by jury.

## VI. Conclusion

WHEREFORE, Monkman prays that the Court:

A. Enter a declaratory judgment that he gave timely and valid notice of rescission of the credit transaction pursuant to TILA.

B. Enter a declaratory judgment adjudicating the net amount that is due by him in tender as to TILA rescission of the credit transaction.

C. Enter a declaratory judgment that any foreclosure sale of the home conducted on September 22, 2010 would be void.

D. Enter an order exercising the Court's equitable jurisdiction to alter the timing of tender to allow Monkman a reasonable time to sell the home to tender the amount due by him in TILA rescission as to the credit transaction.

E. Enter an Order requiring defendants to pay the reasonable attorneys' fee of Monkman's legal counsel for preparing, filing, maintaining, and prosecuting this action.

Respectfully submitted,

**DAVID M. MONKMAN**

By _____
Counsel

Henry W. McLaughlin (VSB No. 07105)
Law Office of Henry McLaughlin, P.C.
Eighth and Main Building
707 East Main Street, Suite 1375
Richmond, Virginia 23219
Counsel for David M. Monkman